IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 06, 2015

## IN RE BRAYDEN S.[1]

**Appeal from the Juvenile Court for Cheatham County**
**No. 2012707      Phillip A. Maxey, Judge**

_____

**No. M2014-02241-COA-R3-PT – Filed September 11, 2015**

_____

This case stems from a proceeding in which the parental rights of the parents of a two year old child were terminated due to severe physical abuse of the child and upon the court's finding that termination would be in the child's best interest.   Mother appeals the holding that termination of her rights was in the best interest and the court's admission of the testimony of one witness.   Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. R3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P. J., M. S., and W. NEAL MCBRAYER, J. joined.

Jennifer T. Hall, Nashville, Tennessee, for the appellant, Brittney K.

Herbert H. Slatery, III, Attorney General and Reporter; and Jordan Scott, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee Department of Children's Services.

**OPINION**

Brayden S. was born out of wedlock to Brittany K. ("Mother") and Wesley S. ("Father") in November 2012.   On December 27, the parents took Brayden to the Gateway Medical Center where he was found to have suffered various physical injuries. Brayden was transferred to Vanderbilt Hospital where he was diagnosed with injuries

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

consistent with abusive head trauma including: multiple subdural hematomas; skull fracture; twenty-four rib fractures in multiple stages of healing; a corner fracture of the tibia; retinal hemorrhages; symptoms of brain injury; seizing; and troubled breathing, which required intubation.

Following receipt of a referral, on December 28 the Department of Children's Services ("DCS") filed a Petition to Adjudicate Dependency and Neglect and Severe Abuse, Temporary Custody and Ex Parte Order. A Protective Custody Order was entered by the juvenile court magistrate on that date placing Brayden in the temporary legal custody of DCS and setting a preliminary hearing for January 2, 2013. On January 2, the juvenile court judge entered an order continuing the DCS custody. A third protective custody order was entered on January 8 which was duplicative of the January 2 order.

A permanency plan was developed on January 8, 2013 and ratified on February 12, identifying reunification as the goal and including the following requirements for Mother: participate in a minimum of four hours per month visitation; pay child support; provide a safe, stable, and drug free environment; submit to random drug screens; obtain a legal source of income; attend all Child and Family Team Meetings ("CFTMs"), Foster Care Review Board ("FCRB") meetings, court hearings, and Tennessee Early Intervention System ("TEIS") appointments; attend couples' counseling; attend Brayden's doctor appointments; and demonstrate knowledge to properly care for Brayden. Mother participated in the creation of this plan, had it explained to her, and was given a copy of the Criteria & Procedure for Termination of Parental Rights, which she signed on January 8.

Brayden was released from the hospital on January 9 and placed in DCS foster care. In June Brayden was placed in the care of his paternal grandmother, Debora S. A second permanency plan was developed on June 26, listing the same goals as the January 8 plan; the record does not show that the June 26 plan was ever ratified by the court.

By order entered on September 24, the court adjudicated Brayden to be dependent and neglected as a result of severe abuse by both parents; on the basis of that finding, an order was entered on October 7, leaving Brayden in DCS custody and relieving DCS of its responsibility to make reasonable efforts to reunify Brayden with his parents. The Permanency Plans developed after the entry of the October 7 order identify adoption as the goal and provide that Mother was to visit Brayden four hours per month and pay child support.[2]

---

[2] The Permanency Plans listing the goal of adoption were developed on February 20, 2014, though the record does not show that this plan was ratified by the court, and on June 12, 2014, which was ratified on July 25, 2014.

DCS filed a Petition to Terminate Parental Rights and for Decree of Full Guardianship on March 31, 2014. The case was heard before the Juvenile Court of Cheatham County on September 26. On October 7, the court issued its order terminating the parental rights of both parents on the grounds of severe child abuse, holding:

This Court's already found in August of last year that there was severe abuse on this child. In that hearing, what was presented, and what was accepted by the Court, is that the child had 24 rib fractures –some were older rib fractures – subdural hematomas, tibia fracture. In that hearing, it was determined that [Mother's] drug use could reasonably interfere with her ability to appreciate the significance of what happened or what was happening that gave rise to the incident that caused the severe abuse finding. So I know your client has had a drug problem for quite some time. Of course, her rights were not terminated at that time, but the Department didn't have to go the extra mile to make reasonable efforts. Your client says that she has attempted to make efforts on her own, and I've read these. . . . Most of these reports from your visits are really good, but, of course, those reports can't stand alone.

I can appreciate the significance of a drug problem, of a drug addiction. . . . What we have here is an additional element. We have a child involved. . . . I can't imagine any greater incentive to try to get a grip on a drug problem than to have your own child taken away from you forever, and that's what we've been dealing with. That's what we've been looking at. You signed this thing back in January of 2013 saying, I understand [what] the Department has to do and they have a timeline to do it. And I understand your attempts to try to rectify the problem. You've been through three rehabs. You've relapsed. You've relapsed. Since that time, you've been using cocaine, marijuana, methamphetamine, and your pain pills. You keep relapsing.

I have to look at the best interest of this child. You keep relapsing through a mental, psychological, physiological addiction to these drugs. And, again, I can understand that. I can appreciate that, but I can't put off the permanence for this child to allow you time to kick the habit. I mean, I don't know. Are we talking about another 18 months, or are we talking about when the child turns 18 years old before you get it together? I have to look at permanence for this child.

So I do find that grounds exist under severe abuse 36-1-113(g)(4). Looking at the best interest, you've not made the proper adjustments to the

circumstances which brought this child into custody in the first place. You cannot prove that the change in caretakers or physical environment is likely to have an emotional, psychological, or medical impact on this child.

I don't find that you're able to care for this child, ma'am, and I don't find it's in the best interest for you to keep making the attempts to get yourself clean and this child is just in limbo. So I find it's in the best interest that your parental rights be terminated.

Mother does not appeal the ground upon which her parental rights were terminated[3]; rather, she contends that the court erred in admitting the testimony of one witness and in holding that termination was in Brayden's best interest.[4]

## I. STANDARD OF REVIEW

A parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer,* 455 U.S. 745 (1982)). Our termination statues identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B. IV*, M2004-00999-COA-R3-PT, 2005 WL 1021618, at *7 (citing Tenn. Code Ann. § 36-1-113(g)). A party seeking to terminate the parental rights of a biological parent must prove at least one of the statutory grounds for termination. Tenn. Code Ann. § 36-1-113(c)(1); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Secondly, the party must prove that termination of the parental rights of the biological parent is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky v. Kramer*, 455 U.S. 745, 766-69 (1982); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Thus, both the ground for termination and the best interest inquiry must be established by clear and convincing

---

[3] We concur with the court's determination that the ground of severe abuse was established by clear and convincing evidence.

[4] Father stipulated to the grounds of severe child abuse and that termination was in the best interests of the child; he is not a party to this appeal.

evidence. Tenn. Code Ann. § 36-3-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id.*

## II. TESTIMONY OF DEBORA S.

Mother first contends that the court erred in allowing the testimony of Brayden's paternal grandmother, Debora S., in violation of the rule of sequestration at Tenn. R. Evid. 615.[5] During the preliminary stages of the trial, the witnesses were sequestered in accordance with the rule; Debora S. stayed in the hallway outside the courtroom. Prior to being called to testify, Debora S. spoke with her daughter, Christy S., who was not sequestered; she had been observing the trial, became emotional during Father's testimony, and had stepped out of the courtroom to compose herself. As Debora S. was comforting her, their conversation was observed by a court officer and reported to the court. Both Christy S. and Debora S. were questioned by the court as to the nature of their conversation[6]; the trial court permitted Debora S. to testify when she was later called as a witness by DCS. Mother contends that the hallway conversation violated Rule 615 and tainted Debora S.'s later testimony.

---

[5] Tenn. R. Evid. 615 reads in pertinent part as follows:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. . . .

"The purpose of th[is] rule is to prevent one witness from hearing the testimony of another and adjusting his testimony accordingly." *State v. Coulter*, 67 S.W.3d 3, 51 (Tenn. Crim. App. 2001) (citing *State v. Harris*, 839 S.W.2d 54, 68 (Tenn. 1992)).

[6] Christy S. testified that they discussed Father's appearance and his testimony about who cared for Brayden, which upset her because she was not mentioned; Debora S. testified that they only discussed how Father appeared, not his testimony.

As we consider this issue, we note that Mother's brief does not clearly articulate how the Rule may have been violated by the court's allowance of Debora S.'s testimony. Mother's brief also does not provide the "appropriate references to the record" as required by Tenn. R. App. P. 27(a)(7)(A) to establish how the testimony violated Rule 615.[7]

We have reviewed the entire testimony of Debora S. and Christy S. related to this incident, as well as the rulings of the court. Considered in sequence and in context, the record shows that, after interrogating Debora S. and Christy S., the court determined that Debora S. would not testify with respect to any grounds supporting termination, but only with respect to her desire to adopt Brayden. The court ruled that "[I]f her testimony is being offered only for where this child may potentially go, if I do find that the parental rights should be terminated, I don't think that the discussion, whatever that discussion was, whether you believe the daughter, whether you believe the mother, I don't think that's prejudicial." The court did not make a specific finding that the hallway conversation violated Rule 615[8] but ruled that Debora S. could not be questioned "in regard to anything that was discussed outside of this courtroom regarding the care given by [Christy S.] … I don't want that to be tainted by anything that she may have been told outside of the courtroom."

Because Rule 615 does not set forth specific sanctions to be imposed when it is violated, "trial courts have significant discretion when deciding how best to deal with its violation." *State v. Jordan*, 325 S.W.3d 1, 41 (Tenn. 2010) (citing *State v. Upchurch*, 620 S.W.2d 540, 543 (Tenn. Crim. App. 1981)). The court's discretion "should be exercised in light of both the policies at issue as well as the particular facts and circumstances of the case." *Jordan*, 325 S.W.3d at 41. The court's statement and ruling acknowledge the conflict in the recollections of Debora S. and Christy S. regarding the conversation, as well as the purpose for Debora S.'s testimony. Under these circumstances it was entirely appropriate and within the trial court's discretion for the court to limit her testimony in the manner in which it did. Upon our review of the record, we find no abuse of discretion in the court permitting Debora S. to testify.[9]

---

[7] Mother's brief cites to twelve pages of the trial transcript, most of which contain argument of counsel.

[8] Upon our review of the transcript, we concur that the testimony was conflicting but that, in any event, any violation was inadvertent.

[9] In addition, we note that the court based its decision to terminate Mother's parental rights on its finding of severe abuse and that Mother had not made proper adjustments to the circumstances which brought the child into custody; the hallway conversation between Debora S. and Christy S. did not touch on any of these topics.

## III. BEST INTEREST

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. The legislature has set out a list of factors at Tenn. Code Ann. § 36-1-113(i) for the courts to follow in determining the child's best interest.[10]  The list of factors in the statute "is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest." *See In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *State of TN Dept. of Children's Servs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)).

---

[10]  The factors at Tenn. Code Ann. § 36-1-113(i) are:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

The court's holding that termination of Mother's rights was in Brayden's best interest implicates the factors found at Tenn. Code Ann. § 36-1-113(i)(1), (2), (3), (5), (6), (7), and (8); Mother contends that the court did not consider the factors listed at Tenn. Code. Ann. § 36-1-113(i)(2), (3), (4), or (5).[11] We have reviewed the record, and it clearly and convincingly supports the court's determination that Mother had not made adjustments to her life sufficient to address the problems which led to Brayden coming into DCS custody and that Mother was unable to care for him. Specifically, Mother testified that she did not have a job and had no source of income; that any money she got went toward the purchase of drugs; that her drug use impaired her ability to maintain a job; that she had been under the influence of drugs while visiting with Brayden. Further, we agree with the trial court that Brayden's best interest necessitated the stability achieved by the resolution of this matter, which Mother testified she could not provide, stating she could not be a "good mom, a stable mom, right now." She further testified that she had been in rehab three times for her drug abuse since Brayden was taken into DCS custody and had completed only one program.

In accordance with the evidence, we conclude that the holding of the court is supported by clear and convincing evidence and discern no error in allowing the paternal grandmother, Debora S., to testify. The decision of the trial court is affirmed.

_____
RICHARD H. DINKINS, JUDGE

---

[11] Mother asserts that "the Department [of Children's Services] never made reasonable efforts toward reunification." Mother also states that "the bias against the mother that was apparent from the testimony [of] DCS staff inhibited them from helping her reunify with her child." In support of this statement, mother cites 49 pages of the transcript, several pages of which contain testimony of family members and evidentiary objections and responses from counsel. First, this general and vague reference to the transcript does not provide the "appropriate references to the record" as required by Tenn. R. App. P. 27(a)(7)(A); second, upon reviewing the testimony to which we have been cited, we do not perceive the bias Mother alleges. Once there was a finding of severe abuse, the court entered an order on October 7, 2013 that relieved DCS of its obligation to make reasonable efforts toward reunification. It is clear from the record that DCS did make an effort to reunite Mother and Brayden prior to October 7 by developing a permanency plan, funding therapeutic visits, providing a referral and background information for a psychological assessment, and administering drug tests. Mother's argument is without merit.